IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION |
| ELOY ZURITA, JR., | NO. 1:19-CR-387-ELR-CMS |
| Defendant. | |

## ORDER AND REPORT AND RECOMMENDATION

On October 1, 2019, a grand jury sitting in the Northern District of Georgia returned a two-count indictment against Defendant Eloy Zurita, Jr., charging him with conspiracy to possess with intent to distribute methamphetamine (Count One) and possession of methamphetamine with intent to distribute (Count Two). [Doc. 38]. This case is before the Court on Zurita's Motion to Suppress Warrantless Arrest and All Fruits of the Unlawful Arrest. [Doc. 57].[1] After an evidentiary hearing on the motion, Zurita filed a post-hearing brief, the Government filed a response, and Zurita filed a reply. [Docs. 71, 75, 76]. For the reasons discussed below, I **RECOMMEND** that the motion be **DENIED**.

---

[1] Zurita has also filed a pro se motion for production of evidence and a pro se motion for ineffective assistance of counsel. [Docs. 36, 52]. These motions will be denied as moot because they address Zurita's complaints with prior counsel, who has since been replaced.

1

I.   FACTS

On May 27, 2020, I held an evidentiary hearing on the motion to suppress at which the government called Drug Enforcement Administration ("DEA") Task Force Officer Thomas Jordan Mileshko as a witness. [Doc. 70, Transcript ("Tr.")]. Officer Mileshko testified that on April 23, 2019, his task force used a confidential source ("the CS") to set up a deal to purchase five kilograms of methamphetamine from Hugo Enrique Ruiz-Valencia, a source of supply based in Mexico. [Tr. at 10]. The CS had assisted the DEA on several previous occasions by lining up similar transactions. [*Id.* at 11].

For the deal on April 23, 2019, the CS coordinated with people in Mexico to set up the time and place for the meeting, and law enforcement officers were monitoring those conversations. [Tr. at 11–13]. The original plan was for the courier(s) to bring the drugs to a bakery off Veterans Memorial Highway around noon. [*Id.* at 12]. The location was then changed, and the CS was told to go to a QT gas station on Mount Zion Boulevard, where the CS was to wait for further instruction. [*Id.* at 13].

Officer Mileshko testified that he was on the scene at the QT, watching cars coming in and observing what they did. [Tr. at 15]. He testified that around 2:30 that afternoon, he observed a Buick Enclave come into the parking lot and park to

the left of the front entrance. [*Id.*]. After the passenger, who was later identified as Zurita, went inside the QT and came back very quickly, the vehicle remained in that parking space for approximately ten to fifteen minutes. [*Id.* at 15–16]. During that time, the driver, who was later identified as Carpino Miranda, got out of the car and walked around the parking lot while talking on one phone and looking at another phone. [*Id.* at 16]. Officer Mileshko testified that Miranda's behavior was suspicious and that he suspected that the Buick Enclave was the car that the CS was supposed to meet. [*Id.*].

The Buick Enclave then moved to Pump 20 and "just sat there" for about five minutes. The occupants did not get gas or do any other activity. [Tr. at 16]. The CS then received a call from Ruiz-Valencia indicating that the meeting would take place at Pump 20, where the Buick Enclave was parked. [*Id.* at 16–17]. At this point, the officers wanted to get the vehicle out on the road so that they could use the Georgia State Patrol ("GSP") to conduct a traffic stop, and they instructed the CS to change the meeting location. [*Id.* at 17, 18]. The CS called Ruiz-Valencia and told him that he did not feel comfortable at the spot, and the CS said he wanted to move the meeting to Home Depot, a mile down the street. [*Id.* at 17]. Two minutes later, the Buick Enclave exited the QT parking lot and headed in the direction of the Home Depot. [*Id.*].

Officer Mileshko followed the car to the Home Depot, as did GSP. [Tr. at 18]. During that drive, GSP was not able to conduct a stop based on a traffic violation. [*Id.*]. The Buick Enclave arrived at the Home Depot and parked at the very back of the parking lot which Officer Mileshko believed "wasn't a place that somebody would park to go inside of Home Depot." [*Id.*]. The Buick Enclave then "sat there for some time," and eventually Miranda, the driver, got out of the vehicle. [*Id.* at 18–19]. Again, Miranda walked around the parking lot, talking on one phone while looking at another phone in his hand. [*Id.* at 19]. He did this for about five minutes. [*Id.*]. According to Officer Mileshko, Miranda got in and out of the car several times, following the same pattern. [*Id.*]. Miranda eventually got back in the car and drove around the parking lot, going up and down the rows "like he was looking for somebody or something." [*Id.*]. Eventually, he parked back in the same area where he had originally parked. [*Id.*].

After parking the car again, both Zurita (the passenger) and Miranda (the driver) got out of the vehicle and went inside Home Depot. [Tr. at 19]. They bought a few items and got in the self-checkout line. [*Id.* at 20]. Miranda paid first and exited the building, while Zurita stayed inside after paying. [*Id.*]. At that point, Officer Mileshko instructed the GSP to arrest Miranda, and after waiting a few moments for that to occur, he and a DEA agent arrested Zurita inside the Home Depot. [*Id.* at 21].

According to Zurita's motion, after the arrests, law enforcement searched the Buick and discovered drugs.  Additionally, several search warrants were obtained based on Zurita's post-arrest statements.  Through his motion to suppress, Zurita moves to suppress all the evidence obtained as a direct result of his illegal arrest (i.e., fruit of the poisonous tree).  [Doc. 57 at 5–6; Doc. 71 at 5–6, 8].

## II.    DISCUSSION

The Fourth Amendment to the United States Constitution provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  An arrest is considered a "seizure" of the person.  *See United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009).  Whether an arrest is reasonable is determined by the presence or absence of probable cause for the arrest.[2]  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (internal quotation marks omitted).  This probable cause standard is

---

[2] A warrantless arrest does not violate the Fourth Amendment rights of the arrestee if the arrest: (1) is conducted in a public place; and (2) is supported by probable cause to believe the arrestee has committed a felony. *See United States v. Watson*, 423 U.S. 411, 423–24 (1976).  Here, Zurita does not challenge the "public place" portion of the test, which makes sense because he was arrested in a Home Depot store during regular business hours.

5

practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Probable cause exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted).

In his post-hearing brief, Zurita argues that at the time of his warrantless arrest, the Government did not have probable cause to arrest him. [Doc. 71 at 5]. He states, "law enforcement had no basis to suspect Mr. Zurita of any unlawful acts as all they had observed was Mr. Zurita as a passenger in a vehicle. While law enforcement may have suspected that Mr. Miranda was in contact with others in relation to the CS setting up a narcotic sale, that suspicion of Mr. Miranda was not sufficient to provide probable cause to arrest Mr. Zurita." [*Id.* at 5–6].

The Government responds, and I agree, that there was ample probable cause to believe that Zurita was engaged in methamphetamine trafficking at the time of his arrest. [Doc. 75 at 1]. The evidence presented at the hearing reflects that on the date of the arrest, the officers conducting the surveillance had significant information from a reliable CS who had previously set up similar deals for the DEA. [Tr. at 11]. The evidence showed that the CS was in direct contact with the Mexican trafficker

6

who controlled the movement of the drugs. [*Id.*]. The CS relayed information in real-time to the officers about the deal taking place at the QT on Mount Zion Boulevard. [*Id.* at 12]. The officers then verified that information by surveilling the QT parking lot and identifying the Buick Enclave as possibly being the vehicle used by the courier. [*Id.* at 12–13]. The CS relayed information about the deal happening at Pump 20, and officers observed the Buick Enclave move to that pump. [*Id.* at 16–17]. The CS then changed the location to the Home Depot a mile down the street, after which the Buick Enclave drove to that location. [*Id.* at 17]. This solidified the officers' reasonable belief that the drugs were in that vehicle. [*Id.*].

The government also presented the direct eyewitness testimony of Officer Mileshko, who personally observed the conduct of both the driver (Miranda) and the passenger (Zurita) at both locations. [Tr. at 15]. At the QT, Miranda acted suspiciously, walking around the parking lot while talking on one phone and looking at another. [*Id.* at 16]. The vehicle's occupants then acted suspiciously when they moved to Pump 20 but did not get gas or do anything one typically does at a gas pump. [*Id.*]. After the CS moved the location to Home Depot, Officer Mileshko observed Miranda and Zurita drive to Home Depot, park far away from the entrance, and continue to look for someone or something. [*Id.* at 17-18]. Based on these facts, it was imminently reasonable for the officers to believe that the occupants of the Buick Enclave were the drug traffickers they expected to meet. *See Ornelas v.*

*United States*, 517 U.S. 690, 700 (1996); *United States v. Ortiz*, 422 U.S. 891, 897 (1975).

Although Zurita was never seen engaging in facially criminal activity, innocent behavior "frequently will provide the basis for a showing of probable cause." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). It was reasonable for officers to conclude, based on their experience investigating drug crimes and common-sense inferences about human behavior, that there was probable cause to arrest Zurita without a warrant based on their information from the CS and their own observations.

At the time of Zurita's arrest, the officers knew that the passenger (Zurita) had been present in the car with the driver (Miranda) at the QT. [Tr. at 15]. They knew that someone in the vehicle—most likely Miranda, who was talking on one phone and looking at another—was receiving instructions about where to go to conduct the drug deal. [*Id.* at 16]. The officers knew that Miranda was behaving suspiciously in the QT parking lot and that Zurita was present and observing Miranda's behavior. [*Id.* at 15, 16]. The officers knew that both occupants of the car had been present when the car moved to the gas pump and that neither occupant had exited the vehicle to get gas or do anything else one typically does when parked at a gas pump. [*Id.* at 16–17]. The officers knew that both men had been in the car as it drove directly from the QT to the Home Depot and later when the car parked far away from the

store entrance. [*Id.* at 17, 18]. And the officers knew that both men had been present when the vehicle drove up and down the parking aisles at Home Depo, clearly looking for someone. [*Id.* at 19].

Considering the totality of the circumstances, I easily conclude that the officers in question had a reasonable belief that both men—Miranda and Zurita—were in the process of trafficking illegal drugs at the time of the arrests. The facts taken together show that the law enforcement officers had sufficient trustworthy information to cause them to believe that an offense was being committed at the time of the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 372 (2003); *United States v. Ashcroft*, 607 F.2d 1167, 1171 (5th Cir. 1979).

### III.  CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Zurita's Motion to Suppress Warrantless Arrest and All Fruits of the Unlawful Arrest [Doc. 57] be **DENIED**.

Additionally, Zurita's pro se motions for production of evidence and for ineffective assistance of counsel [Docs. 36, 52] are **DENIED AS MOOT**. Both motions pre-date appointment of current counsel and appear to relate to issues Zurita had with prior counsel. To the extent Zurita believes that he has not received discovery to which he is entitled, he may file a motion through his court-appointed counsel.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore **ORDERED** that this case be and is hereby **CERTIFIED** as ready for trial.

    **SO ORDERED AND RECOMMENDED** this 4th day of August, 2020.

*Catherine Salinas*
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE